141032 Bayer CropScience AG v. Dow AgroSciences LLC Mr. Gaspar, when you're ready. Thank you, Your Honor. May it please the Court, Chris Gaspar for the Bayer party, and I've requested if it's acceptable to the Court, three minutes for rebuttal time. Bayer seeks reversal and remand of a summary judgment decision of non-infringement that ended a case that involved contract interpretation questions that the Third Circuit law required a jury to resolve. The two errors below that I'll focus on today are number one, the Court's allowance of English substantive law as the choice of law in the contract to override the Third Circuit's procedural requirement that an ambiguous contract be resolved by a jury. That's point number one. Point number two is that the Court, also in the process of applying English law, resolved genuine issues of material fact and also failed to draw inferences in Bayer's favor from undisputed facts in the record. With regard to ambiguous contracts going to a jury, it's a question of English law, and English law requires a look at both the contract language and the factual matrix. So if your question is, once the factual matrix and the English, excuse me, the… If we find the terms of the contract clear based upon the contract and the factual matrix, it doesn't matter about whether this needed to go to a jury or not because we can interpret the language ourselves. Well, to parse it and not to avoid the question, Judge Hughes, if the unitary exercise is performed correctly under English law, which is to marry together the language of the contract and the factual matrix… All I'm asking is you started out by saying that the Court erred because it was an ambiguous contract and to resolve ambiguities, you send it to the jury. But if it's not ambiguous, it doesn't have to go to the jury. I think simply put, yes. Yes, that's right. Yes. It lends itself to a yes or no answer, and your answer is yes. Yes. If it is the case that the contract language is clear, unambiguous, when read by a reasonable person in view of all of the undisputed facts in the factual matrix and all inferences from those facts are drawn in Bayer's favor, it still is unambiguous, then yes. We don't have to confront the issue that was presented. Then your first issue has gone away. So now do you want to address your second issue? If that first issue has gone away, and I'm taking signals from the Court, I will go straight to the genuine issues of material fact. We have a number of them. The factual matrix includes a requirement that we consider the genesis of the contract, background facts if the parties knew about that, also a requirement that we consider the business purpose for entering into these contracts. Here we have two contracts executed on the same day that are of most interest among 14 different contracts that were executed between Bayer on the one side and a Stein or MS Tech entity on the other side. Focusing on the two contracts with the grant language is the central focus here. Reply at page 9, for example, lays the two grant language provisions out next to one another. We have a question about, in view of that language, the language on the Stein contract one hand, which is allowing increasing and selling seeds, to be compared with the grant language in the MS Tech agreement, which is to exploit events. We automatically see a syntactical, we immediately see a syntactical difference. On your view of the correct interpretation of the contract, who has the right to sell the glyphosate seeds? It depends on what type of condition we're talking about. And this actually raises, I'll come back to it, a further genuine issue. But Bayer was, I think, caused, Bayer's position was caused to be confused in the record below and also in the appellate record. The specific point that Bayer is trying to make, and it has never argued, that MS Tech lacked the right to commercialize its events. That was never an argument. The exploit language in the MS Tech contract sets out the activities, the specific actions that are permitted, with respect to events. Not with respect to seeds. With respect to Bayer soybean events and MS Tech soybean events. And MS Tech. And MS Tech soybean events, that's right. Let me go back to my question simpler. Does Bayer, on your view of the contracts, both contracts, does Bayer have the right to sell these glyphosate-treated seeds? Yes. Bayer retains the rights to sell commercially, to increase, to market, to propagate, to breed seeds containing the glyphosate gene. We retain that right. We provided a right to MS Tech with respect to exploiting events. We provided a non-exclusive right to the Stein entity to increase, market, and sell seeds. And this is a very understandable and usual, frankly, arrangement in the seed industry. The contract is explicit as to the carve-out for Stein. Silence as to this retained right of Bayer, point us to where in the contract we can find such retention. Well, if you look at the two contracts, the Stein contract on the one hand and the MS Tech contract on the other, you see that there is an exclusive right in the MS Tech contract, but only with respect to exploiting events. MS cannot sell, Stein can sell, and Bayer can sell? Yes, and I want to say more, Judge Newman, than just using the verb, because how the activity and the verb operates on a particular object is critically important here. So we aren't saying that we appear to have given the right to MS Tech to have some commercial benefit to using these events, but now we're changing our mind. That's the way this has been portrayed all along, and that's absolutely not right. A person, not of ordinary skill because we're not talking about the patent laws, but the English laws of contract interpretation cut up the same sort of objective and reasonable person, which is a person who would know the industry, understands the background facts, has knowledge of what the parties know. An industry insider knows very well that there's a very big difference between increasing and selling seeds and exploiting an event. An event is a development right. It's the ability to breed, to create new genetic events, new genetic material, and there's a full transfer of that and full license of that to MS Tech. There is not, however… The event has to be contained in a seed for it to be useful at some point. Or a plant. Or a plant. But the language that you're pointing to doesn't… Do you read it as only giving MS the right to exploit events in plants or in seeds? Well, that's not meant to be a point that trips anyone up. So plants or seeds would be the direct answer to your question, but this is where I really… Use your gene, develop some kind of new seed, and then give it to Stein to commercialize. Right. That's correct. That's exactly right. But they're still selling the seed. They're just not selling it in commercial quantity. They're not increasing it, distributing it for sale, selling it, offering soybean seeds. But they're exploiting it. To the events. They're exploiting the ability to take their events and to license it for someone else to propagate the seeds. Isn't selling it in commercial quantities exploiting their right to do this, too? Arguably. But it's a much more specific right, and it's a much more… I won't say narrow, it's just a different right. And the parties actually chose language, as they are industry insiders, and they both had industry insiders negotiating on both sides of the table here, the language that's expressed here. If they really wanted to give the right to increase market, distribute for sale, etc. to Stein, excuse me, to MS Tech, it wouldn't have appeared as an exception in 3.1.2. Let me read you three statements made by the trial judge. Sure. And see if you agree, as the trial judge suggested you do. The trial judge says, in addition to the plain language of the agreement, material to this court's holding is the following undisputed underline. Right, right. Undisputed record evidence. And he sets out three propositions. I'd like to know whether you are in agreement with them or whether you dispute them. His first proposition… Well, let me jump to the third one in view of your dialogue with our presiding judge, Judge Newman. His third proposition is, it was immaterial to Bayer how any assets were divided between Stein and MS Tech because Bayer intended to divest itself of the assets at issue. Do you agree that there is undisputed record evidence to support that? I do not agree. I'm sorry? I do not agree with the judge's view of that. You do not agree that that's a valid proposition? No, there's in fact a genuine issue of material fact as to what the extent of the divestiture was that was such a focus of… Which goes back to the dialogue you all had because that was the first time I'd heard that Bayer retained any rights. I didn't gather that from… We retained title to the patents. We retained 19 soybean events that were not transferred over, and the Stein and MS Tech entities knew about those. That's in the record at A10-951-52. We transferred eight specific events that we owned, retaining 19. I stand corrected. Let me read you another proposition. Number two, with respect to Stein and MS Tech, the purpose of the carve-out was to limit Stein's rights, not the rights of MS Tech. Do you agree with that proposition? Yes and no. I agree that the purpose of the carve-out as presented to Bayer was presented by the Stein and MS Tech negotiators. Those negotiators were negotiating on behalf of both entities. They were the same people. What they had expressed, and the record seems clear about, is that Stein seed would have been encumbered by obligations it didn't want if it retained the right to exploit events. This is where exploiting events, again, becomes a very different proposition than increasing seeds. Stein seed was saying, we don't want the right to exploit events. If we have that, we have to pay Monsanto. Instead, put that in a different entity. It's a very, very different proposition. People in this industry and a reasonable and objective viewer understanding the differences in these things would know that. In fact, even the Dow contract with MS Tech defines events in a particular way and seed in a different way. These are the words that are used to describe different rights in this industry. So no, I don't agree at all with the idea that the divestiture, your point number three, was a complete one at all. But you do agree with number two. Let me read you number one. The carve out of, quote unquote, carve out, of rights in the MS Tech agreement was done at Stein's and MS Tech's insistence because Stein could not take on the rights to certain underlying assets without triggering undesired obligations to a third party than the sample company. Yes, I agree with that. You do agree with that? Yes. That's right. Two out of three isn't bad. Well, if that were the extent of it, perhaps. But there are other genuine issues that are found within the factual matrix that need to be explored as well. Thank you. Thank you, Your Honor. The genesis of this set of rights in two different contracts came from Mr. Saluri, one of the negotiators on the Stein and MS Tech side. He asked, using these words, to split up the licenses between the two parties, Stein and MS Tech. Then an email, and that's in the record at A8560. Then an email went back to him the next day confirming his request to, quote, split up these license rights. This is evidence in the record that was not discussed at all by the district court below, and this is going straight to the genesis of the contract. You mentioned three points, but there are many, many others that bear, Your Honor, on what it is that was going on in this factual matrix that would have been understood. And as to genesis, that's a disputed material fact. As to business purpose, was it really buyer's goal to get out of the soybean business? It was not for the reasons that I mentioned to Judge Newman. And then industry background is yet another set of questions that present genuine issues of material fact. What would this reasonable person have understood and known? The words, increase, market, distribute, for sale, sell, and offer to sell soybean seeds, to mean, not just in the abstract, but specifically compared to the right to exploit events. So those are material facts that also have to be considered. There were a number of inferences that were not drawn in buyer's favor that should have been from facts that were not disputed, not the least of which is the ownership point, retaining patent ownership. It's undisputed that buyer licensed out technology, but retained the patent rights. The inference there is that buyer left the door open to licensing further or to itself entering the market in places where it hadn't given full rights to somebody else. Another set of facts that go to the business purpose in the factual matrix is that Stein Seed Company, the one that got the right to sell seeds, was an established seed company. MS Tech was a paper company. It hadn't existed before this transaction. It was created for this transaction. And we are now supposed to believe that the inference is unreasonable to flow in buyer's direction, that all MS Tech was going to do was to grant a right to Stein to the events and move on. We're supposed to instead believe that this Stein entity that's up and running is going to receive rights to sell seeds, but so is the paper company. That doesn't make any sense. It's not commercially reasonable. And it doesn't reflect an inference that's appropriate considering the business purpose. I'll stop now. We'll save you a full amount of time. Let's hear from the other side. Thank you. Mr. Davies. Good afternoon, Your Honor. As Your Honor's question portrayed, there's nothing in this agreement that suggests that buyer has retained any rights at all. In fact, if you go to the main article, which is Article 3.1.2, what you see is that MS Tech has the right to sell certain seeds. And it's conveyed in a sweeping grant to MS Tech with a clear but narrow exception. And we'll start with the language and then we can come back to Your Honor's questions about buyer. The grant is from buyer. This is in Appendix 7403. You're welcome to look at their reply brief. The grant is from buyer to exploit MS soybean events. And when you look at the definition of exploit, which is on 7399, Volume 2, Your Honor, it includes to make, breed, produce, condition, market, offer, sell, import, export, stock, use, or otherwise dispose of. I mean, this is lawyers really drafting broad language and their put expert said it was very broad language. So we have exploit, very broad language, sweeping language. And then it's to exploit what? It's to exploit MS soybean events. It's also a defined term and that's at 7401. And that includes events made by or for MS Tech. And all events mean is that this genetically modified material has been inserted into a cell. So putting all that together, and we'll get to the exception in a second, but the grant, it couldn't be more sweeping. It's a grant to exploit events, which has to mean to sell seeds. It just follows naturally from that broad grant. Now, there is an exception, but that's the grant. The exception is also really clear. It's narrow and it's clear. It just says the grant to Stein. So to understand what that means, you just have to look at the Stein contract, and that's in Volume 2 at 7933. You just need to understand one word, and it's also on page 9. It's that the grant is non-exclusive. So whatever this broad grant took away and gave to the Stein Company, it was non-exclusive. So it can't possibly be a restriction on MS Tech's rights because it was non-exclusive. And we just heard a little bit about the split up that apparently wasn't addressed. But if you go read the exchange on that point at Appendix 7692, you will also see the word non-exclusive. What was given to Stein here was non-exclusive. So that doesn't suggest at all that MS Tech's rights were restricted by this broad grant. Okay, anything else you want to say? Any more questions? I do have one thought that I'll close with, Your Honor. Just that the district court here conducted a very thorough proceeding, really went out of the way. There was two-day hearing, many experts, a lot of evidence, a lot of effort went into this proceeding. And I think that when this court is reviewing such a quality product, I think that it really is just time to sort of put this to rest. I mean, this was a clear contract. There really wasn't any reason for this very expensive production. It's been resolved, and I think it's time for us all to move on. This doesn't really relate to what we've been talking about. It relates to what I asked your friend at the beginning. I'm kind of interested, though, about this conflict between English common law and third circuit law. Why isn't it, if the parties agree to be bound by English law, they're bound by English law for everything. I mean, is there something that would prohibit people from giving up the right to a jury trial? I don't believe so. That's obviously not the way it's been presented. I mean, the parties went under the standard rules of federal procedure, but we've had the same thought, Your Honor, absolutely. But it's a civil case, so presumably, I mean, it might be different if it was a criminal case, but a civil case, parties can contract to do whatever they want. Yeah, but whether you can do that and then invoke the federal process to resolve it. Might it have to be a fairly specific waiver if they want to give up a jury trial? Yes. As you said, it's not here. It's interesting. It's a very interesting question. We only get to that if we decide this language is not plain. Right, and you were interested in that, and so since I have ample time, Your Honor, if you want some good quotes on that, we have Lord Collins, their expert on English law, saying that Appendix 12420, if it's clear, it is the end. We have their expert saying the inquiry will start and usually finish, asking what is the ordinary meaning of the words used. I mean, that's this case. And their expert again, the obvious should perhaps be emphasized, namely that the vast majority of contracts are clear on their face and need no elaborate process of interpretation. That's Appendix 10098. And then there's the Rainy Sky Decision, Appendix 8007, where the parties have used unambiguous language. The court must apply it. And that's essentially where we are here. I do want to just correct, since I have just one factual point, the notion that Bayer retained rights, which Your Honor was interested in. If you go to Appendix 10951, what Bayer was doing was kind of sensible. They were keeping the less advanced, the less developed technology because they didn't know in which market it was going to be useful. But they're very clear that for the technology at issue here that was more advanced, they were selling it and they were getting out. All right. I put that more in the context of the E3 as opposed to as this technology is advanced, a lot has happened. Okay. I'm here for you, Your Honor, but if you have no further questions. If we think of something else, we'll write to you. Make a phone call. Yes, Your Honor. Thank you, Mr. Davis. Mr. Gasper? Mr. Gasper, it was not my intention at the original argument to preclude you from arguing about what law applies and whether you were entitled to a jury trial. I don't want you to feel that you were cut off from that argument if you think it's needed. I'm not sure how much it does need to be addressed. It's in our papers. The reply brief at page 5 collects the cases on which we relied. I thought it was pretty well-written in the papers. So I do appreciate Your Honor's deference on that. The question of whether the language is unambiguous, again, I'll note that you can't just look at the language. English law doesn't allow that. You have to also look at the matrix of facts together with that language, and you have to do it through the lens of a reasonable person. Otherwise, you don't know what you're looking at. So there is an issue of material fact as to what this reasonable person would have known these different words to mean. Increase seeds on one side and exploit genes on the other. As to the thorough proceeding, I don't want to rely on a technicality, but this is much more than a technicality. We had two days of testimony and oral argument on this. That's absolutely right. We had two English law professors who didn't just explain what English law was. They applied it to all of these facts, and they were in the exact opposite direction. That's applying the factual matrix. That's applying the English law. That's looking at the actual language. If that isn't the perfect setup for a genuine issue of material fact that a jury ought to be resolving. They were both law professors? No, one was a law professor, and the other was a recently retired U.K. Supreme Court justice. Well, that's easy. You know which to believe. Yeah, exactly. So in any event, those presentations were made. The court resolved the application of law to fact there. If there's any question about whether this is unambiguous, we're not asking for ruling as a matter of law. We're asking for remand and reversal before remand. But if you look at this contract, the way it really reads, the two of them together, is that you lift the rights up and you put them down. You use the exact same language when you pull them out of MS Tech, and you drop it right into the Stein agreement. To suggest that this is an exception to exclusivity is also syntactically off. I could go into that, but that's an argument that's been made in the papers. If there is one direction this is pointing, it's toward the interpretation that Beyer offers. Even if that's not resolved, it's at least reasonable as an interpretation in view of the language itself. But certainly the language is viewed by this reasonable person, such that we should at least be entitled to have a jury decide this, or at minimum, a jury decide at least the disputes of fact in the factual matrix. Here we have to have these inferences drawn in our favor, and they simply weren't. Beyer was retaining the rights to sell seeds under its patent, but unless MS Tech gave it a license back, we did give MS Tech, in a divestiture sense, rights that we weren't going to try to interfere with. So MS Tech would have had to give us rights back to these particular events it was working with if we wanted to sell seeds that had those particular events. Is that in the same contract? That's the MS Tech contract. So we were not divesting the patents, we were not divesting the events that we had retained. We were giving them the eight events in particular that we sent over, but not everything. So there was an intent to retain rights. Why would MS Tech spend a million dollars for the right to spend money on development if they didn't also have the right to sell? Well, they spent a million, and I'll kind of candidly note that Stein spent $4.6 million to sell seeds. Yes, they got the right to sell. They got the right to sell, exactly. What MS Tech got was, for a relatively low amount of money in this industry anyway, the right to breed this event with other events that MS Tech either had or was going to get rights to so that they could have an additional product line, perhaps. They just can't sell it. And they can license that to Stein. So they did, they licensed it to Dow. Well, they licensed the right to Stein so that Stein could sell the seeds. They don't have the right to sell the seeds themselves. The only seed outlet is going to be Stein. The commercial right to sell and increase seeds doesn't pass through MS Tech. That's the case. Why does the contract use the word non-exclusive when it refers to Stein's license? Because a buyer could also sell. Not without a license from MST. Not without a license to MST for those particular events that were transferred over. But for buyer's own events. Yes. So you say that this I find very troubling. You say that the non-exclusivity is referring to non-exclusivity between Stein and Bayer when the whole clause is talking about here's the rights we're giving to MST with the exception of the rights we're going to give to Stein. That sounds like the non-exclusivity arrangement is between MST and Stein. It doesn't say anything about that Stein now has a non-exclusive license along with Bayer to sell. Well, what Stein got, though, we have to keep in mind, is this non-exclusive license to increase the buyer soybeans that were transferred over to MST. The MS soybean events as defined in that. And that's it. And it can only do it under its brand as well. So there are restrictions put every single sort of way and every single layer into these things to keep the markets working the way that the parties had intended here. If it's not expressly stated, it wasn't granted. The non-exclusivity language, though, is in relation to the license given to MST. That's the way the clause reads, right? Not necessarily. It just says non-exclusive license. It doesn't say non-exclusive license for the benefit of MST. It's on reply page 9. It says the licensor hereby grants to the licensee a worldwide fully paid up non-exclusive license. This is the most important part, without the right to grant sub-licenses. This is why Bayer was fighting so hard. They couldn't get this right to increase and sell seeds through Stein because Stein was prohibited from sub-licensing it. It's a pretty valuable right. That's why Bayer locked it down. Okay. All right. Thank you. Thank you both. The case is taken under submission. That concludes the arguments for this afternoon. All rise.